

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

May 13, 2025

**BY ECF**

The Honorable Paul A. Engelmayer
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007

    Re:   *United States v. Ronald Bauer*, 22 Cr. 155 (PAE)

Dear Judge Engelmayer:

    The Government respectfully submits this memorandum in advance of the May 20, 2025 sentencing for defendant Ronald Bauer.

    The defendant led a sophisticated international fraud ring that used the U.S. securities markets to enrich himself and his co-conspirators by ripping off ordinary investors through pump-and-dump scams. The defendant controlled multiple aspects of this scheme—he secretly acquired controlling interest in small public companies trading on the U.S. securities markets, installed management friendly to his interests to coordinate the "pumps," directed his co-conspirators to engage in deceptive trading to create the appearance of legitimate interest in these companies, organized the misleading marketing materials and promotional campaigns used to pump the stock by convincing ordinary investors to buy shares in highly illiquid, highly speculative energy, tech, and pharmaceutical stock, and then directed the "dump"—selling those inflated shares for profit, which were often then rolled into financing the next pump and dump scheme.

    In total, the defendant and his co-conspirators made more than $15.3 million in the seven companies whose shares he has accepted responsibility for manipulating through this scheme. The defendant personally profited to the tune of over $4 million. The defendant's criminal conduct was flagrant, manipulative, and motivated by sheer greed.

    For the reasons set forth below, the Government respectfully submits that, balancing the nature and seriousness of the offense and the need for specific deterrence against the defendant's acceptance of responsibility—including his consent to extradition—and his family circumstances, a below-Guidelines sentence of 48 months' imprisonment would be sufficient but not greater than necessary in light of the defendant's criminal conduct.

## I. Background

### A. The Offense Conduct

The defendant and his co-conspirators, including his co-defendants, Craig Auringer, Peter Mihaylov, and Daniel Ferris, made tens of millions of dollars in illegal profits by engaging in pump and dumps of U.S. securities traded on the over-the-counter ("OTC") markets. OTC securities, often known as "penny stocks" for their relatively cheap trading prices, often have little natural trading volume and thus are highly susceptible to manipulative promotional and trading techniques. Under the parties' plea agreement, Bauer is accepting responsibility for engaging in securities fraud with respect to the securities of seven issuers. (PSR ¶ 17)

Bauer worked with others, including his co-defendants, to engage in pump-and-dumps as early as 2013. By 2016, the defendant and his co-conspirators started working with the principals of Blacklight, S.A., a Swiss corporation that provided a one-stop-shop offering services to market manipulators like Bauer. (PSR ¶¶ 15-16). Blacklight, for example, held the physical share certificates for the companies that would be pumped and dumped, maintained records distributing the shares amongst "nominee" accounts that purported to officially own the shares on behalf of a straw owner whose name Bauer and others used to hide their control of the companies, executed trades in the issuers' shares using relationships with different brokerages across the globe, and even provided encrypted email and burner cellphone services to high-value clients like Bauer.

The mechanics of the services offered by Blacklight mapped on the steps in the pump-and-dump scheme engaged in by Bauer and his co-conspirators. Generally, the scheme followed several predictable steps. First, the defendant or one of his co-conspirators would identify a thinly traded penny stock (the issuer) to use to execute the scheme. The companies were typically pie-in-the-sky shots at success—energy companies with leases on unexplored lands (e.g., Black Stallion Oil and Gas), pharmaceutical companies researching particular treatments to treat diseases like Alzheimer's or Parkinson's (e.g., Cantabio Pharmaceuticals), or small video game design companies searching for the next Candy Crush breakthrough success (e.g., Steampunk Wizards). Through Blacklight, the Bauer group would purchase shares amounting to a controlling interest (i.e., more than 50%) in the issuer on the OTC markets.

The Bauer group would frequently purchase a "shell" issuer, that is, an issuer that had a publicly traded security but minimal assets and business operations. After acquiring the issuer, Bauer and his co-conspirators would install a friendly management team and change the name of the company and ticker to match the business they wanted to promote. (PSR ¶ 28). For example, for Cantabio, the Bauer group initially purchased a controlling stake in a company called Lion Consulting Group, Inc., which traded on the OTC markets under the ticker LIOC, and then changed its name to Cantabio and its ticker to CTBO. Purchasing a shell issuer typically involved acquiring the issuer's physical share certificates, which Bauer and his co-conspirators caused to be delivered to Blacklight in Geneva to be stored in Blacklight's safe.

Rule 13d-1 of the Securities Exchange Act of 1934 requires any person who acquires more than 5% of a class of registered voting equity to file publicly a Schedule 13D form disclosing their stake. In order to avoid filing required Schedule 13D and hide their controlling stake in these issuers, the defendant and his co-conspirators, working through Blacklight, used so-called

"nominee" accounts to allocate their control blocks to straw owners. (PSR ¶ 25). When the group was ready to commence a pump, Blacklight would allocate the physical share certificates in its safe to nominees each control group member like Bauer selected, such that no nominee possessed more than 5% of the outstanding shares and would be required to file a Schedule 13D. (PSR ¶ 26). Among others, Bauer used the names of a friend, of his parents, of his co-defendant Farris, of a Nigerian national, and of that Nigeran man's ex-girlfriend in Nigeria as straw owners of his nominee entities, using generic names like "World Time Ltd.," "Alveston Partners Inc," and "Pointfort." Blacklight kept records detailing which nominee entities had received which shares, as well as keys linking the nominee entities to their true beneficial owner—for example, using the nickname "Patek" for Bauer, a reference to the luxury watches he favored. Bauer and his co-conspirators at all times retained trading authority over the shares held in their nominee accounts (PSR ¶ 27), and, as described further *infra*, Bauer wielded that authority expertly.

With control of the issuer secure, Bauer and his codefendants then took steps to make the issuer appear more attractive to duped investors than an illiquid security with no trading history. For example, the defendant directed Blacklight to engage in match trades—i.e., placing both buy and sell orders in the same stock on the same day—for no legitimate economic purpose. (PSR ¶ 29). These match trades, as detailed in the parties' plea agreement, served multiple purposes. First, they created trading history for the investing public to reference against before falling for the pump, like the 10,000 share match trade in Black Stallion Blacklight engaged in at Bauer's direction five months prior to commencing the "pump," (PSR ¶ 29(a)), or the 1,000 share Cantabio match trade that set the stock's first market price after the ticker changed from LIOC to CTBO, (PSR ¶ 29(b)). Second, match trades were used to support a stock price during the "dump" by creating the appearance of buying activity, like the 5,000 share Steampunk Wizards match trade. (PSR ¶ 29(c)). Third, they were used to artificially prop up the stock price in order to comply with certain brokerage rules that limited the ability of Bauer and his co-conspirators to sell shares trading at less than $.10 per share, like the 190,000 Black Stallion match trade Bauer instructed Blacklight to engage in at $.095 and change so that he could continue to sell out of his Black Stallion position. (PSR ¶ 29(d)).

After securing control of the issuer Bauer and his co-conspirators then began the "pump" portion of the scheme—creating promotional materials to tout the stock of the companies they had purchased in order to convince ordinary investors to purchase the shares and drive up the price. (PSR ¶ 30). These promotional materials frequently included hyperbolic statements about the company's future prospects—for example, for Steampunk Wizards, a video game company from Eastern Europe purportedly working on a Candy Crush mobile phone game spinoff, the tout stated that investors could walk away with gains of over 2,000 percent and that the stock represented "the greatest wealth generating scenario in a century." Ex. A at 6, 16. For Black Stallion, the tout claimed that the company had started an "exploration program" for oil and gas production where there could be oil and gas worth $2.1 billion as part of the Canadian oil and gas fields. Ex. B at 6, 8. In fact, the company's CEO acknowledged to FINRA that the company not yet begun drilling at the time the tout was issued. And, for Cantabio, Bauer and his associates prepared a "special report" by the "BioScience Report" claiming that, based on hyperbolic and misleadingly presented aspects of Cantabio's operations, the target price for CTBO was $22 per share, even though at time it was trading at under $3 per share. Ex. C at 3.

Bauer and his co-conspirators used mailing lists they had acquired to blast these promotional materials by fax and email to U.S.-based investors. In addition, through his installation of friendly management in these companies, Bauer and his co-conspirators also caused his allies in the company to issue press releases timed to mirror and maximize the impact of the touts, such as for Steampunk Wizards and for Black Stallion. While Bauer took a hands-on role in the preparation of the promotional materials—down to design choices like making sure they used green coloring instead of red, and that the current trading price was always at least $1—he and his co-conspirators took great lengths to hide their roles financing and distributing the promotional materials. Again, with Blacklight's assistance, they created shell companies like "Herwick Ltd." and "Ikon Media" that would be disclosed as the entities funding and preparing the promotional materials, and they paid for the promotional campaigns through wire transfers set up by Blacklight.

The disclosures on the promotional materials misled investors in three material respects. First, by using shell entities to hide their true funding source, investors were duped into believing the promotional materials were prepared by unaffiliated, independent third parties, as opposed to the people who invested in the company and had a—literally—vested interest in the stock price going up. (PSR ¶¶ 30-31; *see, e.g.*, Ex. C at 15). Second, the materials hid not only that the organizers of the promotional campaign were invested in the companies, but that they held controlling stakes in those companies—and in certain instances, had installed their management teams—which, had investors known, would have decreased the value of the publicly available stock by informing them further of the importance of the stock price to the control group and its ability to affect the company. (PSR ¶¶ 30-31). Third, in touting the expectation or possibility that these companies' stock prices would skyrocket astronomically, the promotional materials did not disclose that Bauer and his crew planned to sell their shares during the promotional campaign and well before the share price hit those levels—the "dump"—thereby putting downward pressure on the stock price and making these wild claims virtually unachievable from the start. (PSR ¶ 30).[1]

As the promotional campaigns successfully increased the stock price of the companies Bauer and his co-conspirators controlled, Bauer personally directed the dump—instructing Blacklight's principal to sell the acquired shares in tranches to profit off the pump. (PSR ¶ 32). For example, for Cantabio, text messages and trading records show Bauer texted Blacklight's principal to start selling shares once the price rose from approximately $1 per share to between $2.40 and $3.50 a share. Bauer sent detailed instructions, such as selling in 4,000 to 5,000 share tranches for each $.01 that the share price decreased, allowing Bauer to profit from the pump without selling in such large quantities that would cause the share price to bottom out entirely too quickly. Similarly, for Steampunk Wizards, Bauer-controlled nominee entities like World Time

---

[1] The indictment also describes the defendants' use of a boiler room for a fourth issuer, Cyberfort Software, Inc. The Government does not dispute the fact that Bauer sold that shell issuer, "Patriot Berry Farms," to another group of individuals who used a boiler room to pump the stock that those individuals controlled independent of Bauer. (PSR ¶ 34). But the text messages between Bauer and his co-conspirators make clear that Bauer knew he was being paid the $100,000 exit payment for his interest in Patriot Berry/Cyberfort by that other group in part by proceeds they generated using a boiler room. For example, Bauer participated in group chats where the group that took over Cyberfort sought reimbursement from Bauer for sending money to a "phone room," i.e., a boiler room. *See* Ex. D.

and Pointfort sold hundreds of thousands of SPWZ shares once the price had increased by nearly 100% after the promotional campaign commenced, from an average of $0.62 to $1.30 per share before the pump to between $1.15 and $2.12 after the pump. And Bauer caused World Time to sell out its Blacklight shares after that promotional campaign pumped the share price from $.76 per share to $2.12 per share. Text messages between Bauer, Blacklight principals like Kenneth Ciapala, and Bauer's co-conspirators such as Craig Auringer show that Bauer exercised final trading authority over all of the positions controlled by the Bauer group, and that Blacklight would not execute trades in any nominee account in that group—even those belonging to co-conspirators like Auringer—unless Bauer approved. (PSR ¶ 35).

With the dump accomplished, Bauer then instructed Blacklight to allocate the proceeds to the control group partners proportionate to their interests, pay expenses, and often roll profits into the next pump. (PSR ¶ 33).

For the time period charged in the Indictment—2013 through 2019—Bauer manipulated the securities of at least seven issuers: (1) Cantabio; (2) Virtus Oil and Gas Corp.; (3) Steampunk Wizards; (4) Black Stallion Oil and Gas; (5) PetroTerra Corp.; (6) Black River Petroleum; and (7) Cyberfort, all of which were accomplished through Blacklight. In total, the defendant and his co-conspirators generated over $15.36 million in profits through selling the shares related to those entities. Bauer personally received over $4 million.

### B. The Defendant's Plea, Guidelines Range, and Forfeiture

On March 10, 2022, the defendant was charged by indictment (the "Indictment") in nine counts: one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Count One), one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count Two), four counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 (Counts Three through Six), one count of wire fraud, in violation of 18 U.S.C. § 1343 (Count Eight), and one count of conspiracy to commit concealment money laundering, in violation of 18 U.S.C. § 1956(h) (Count Ten). On March 28, 2024, the defendant, having consented to extradition from the United Kingdom, was extradited to the United States, and, the next day, arraigned before Magistrate Judge Cott. On November 4, 2024, the defendant pled guilty, pursuant to a plea agreement, to conspiracy to commit securities fraud, as charged in Count One of the Indictment. (PSR ¶ 8.)

As agreed to by the parties, and as calculated by the Probation Office, the Guidelines range, which would otherwise be 97 to 121 months' imprisonment, exceeds the statutory maximum of 60 months' imprisonment, and so the Stipulated Guidelines Sentence is 60 months' imprisonment. (PSR ¶¶ 10(12), 101.) Probation recommends the defendant be sentenced to a below-Guidelines sentence of 36 months' imprisonment. (PSR at 33.) As set forth in the Plea Agreement, and pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the Government seeks forfeiture in the amount of $4.38 million (PSR ¶¶ 112), and the Court has entered a Preliminary Consent Order of Forfeiture and Money Judgment. (ECF No. 57).

## II. The Sentencing Guidelines and Section 3553(a) Factors

The Sentencing Guidelines promote the "basic aim" of "ensuring similar sentences for those who have committed similar crimes in similar ways," *United States v. Booker*, 543 U.S. 220, 252 (2005), and so "to secure nationwide consistency, the [Sentencing] Guidelines should be the starting point and the initial benchmark," *Gall v. United States*, 552 U.S. 38, 49 (2007). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

## III. The Court Should Impose a Significant, But Below-Guidelines Sentence

The Government respectfully submits that a sentence of imprisonment below the Stipulated Guidelines Sentence of 48 months' imprisonment would be sufficient but not greater than necessary under the relevant Section 3553(a) factors.

### A. A Significant Incarceratory Sentence Is Necessary in Light of the Nature and Seriousness of the Offense, the Need to Promote Respect for the Law, and the Need to Provide Just Punishment

A significant incarceratory sentence, albeit one below the Stipulated Guidelines Sentence, is necessary in light of the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(1) & 3553(a)(2)(A).

The defendant engaged in a brazen and classic pump-and-dump scheme to steal millions of dollars for himself and his co-conspirators from innocent investors. While living a lavish

lifestyle abroad, he used his connections in the international pump-and-dump network to set up shop in Europe and direct his fraudulent schemes on the OTC markets in the United States. He did this over and over, company after company, building the pumps through issuer acquisition, recruiting nominees, organizing financing, preparing and directing the promotional campaigns, instructing match trading, and then micromanaging the dumps that generated fabulous wealth for him and his cronies. There was no motivation for this crime other than pure greed.

The defendant's argument that the agreed-upon statements of facts is "much more benign than a prototypical pump-and-dump" (Def. Br. at 20) overstates a difference in degree, not kind. To be sure, the Government does not dispute, that, with the exception of the Cyberfort scheme discussed *supra*, the Bauer-ring pumps did not involve boiler rooms. Nor does the Government take issue with the defendant's pointing out that the touts for these tickers involved more hyperbolic puffery about the companies' expected future performance than affirmative false statements about past events, or that the match trades identified in this investigation are more limited than in other pump-and-dump cases.

But the purpose, nature, and effect of the scheme remains the same. The defendant and his co-conspirators secretly amassed control of these companies not because they believed in them and sought genuine financing on the OTC markets. The point of the scheme was to pump up the price, cash out, and leave innocent investors holding the losses. And the defendant did just that. Over and over and over. Contrary to the defendant's argument that he was legitimately investing in these companies out of a genuine belief that they would succeed with additional financing, out of the seven companies included in the parties' agreed-upon statement of facts, the defendant sold virtually all of his shares in all seven during or contemporaneous with the pump schemes. Indeed, had this case gone to trial, at least two co-conspirators would have testified that when Bauer and his co-defendants identified a company for which they had a real, genuine belief that the company could succeed with additional financing, they generally sought that financing on other markets, such as the Canadian stock market, not on the U.S. OTC markets, which they used for the pump-and-dumps where they had no intent to retain the shares for the long term. (*Cf.* PSR ¶ 94 (investment in The Brag House that IPO'd on Nasdaq)). By hiding their control over these penny-stock companies and their intent to cash out once the price was artificially inflated from investors while publicly proclaiming the stocks were going to the moon, the defendant orchestrated and repeatedly committed a textbook pump and dump.

Bauer's claim that, had he disclosed his interest in these stocks, he "arguably would have been in full compliance with the federal securities laws" (Def. Br. at 21-22) ignores the other attributes of this fraudulent scheme and, given that Bauer did not disclose his interest, presents an unhelpful counterfactual. To be clear, it does not appear that Bauer disputes any facts about the scheme that would necessitate a *Fatico* hearing to resolve. But by highlighting the one aspect of the scheme that is consistent with his allocution and downplaying the others, Bauer's sentencing submission minimizes the scope and harm caused by the scheme.

In light of the seriousness of the offense and the harm it caused, a punishment that is just and commensurate with the defendant's conduct is required. Justice requires that Bauer be punished with a significant incarceratory sentence.

### B. Deterrence Warrants a Significant Incarceratory Sentence

Both general and specific deterrence further support the imposition of a significant incarceratory sentence.

The Court's sentence must specifically deter Bauer from committing additional criminal activity. Bauer unquestionably knew his repeated conduct in this case was wrong. In 2005, the Securities and Exchange Commission filed a complaint against Bauer for engaging in a pump-and-dump scheme with respect to his own company, "The Bauer Partnership Inc." on the U.S. OTC markets. *See SEC v. Bauer*, 3:05 Civ. 426 (N.D. Tex. Mar. 2, 2005). Like in this case, Bauer was alleged to have used nominee accounts, his control over the management of the company, purportedly independent promotional campaigns paired with company press releases, to engage in a pump-and-dump scheme. *Id.*. Bauer reached a no-admit, no-deny settlement with the SEC whereby he agreed to: (i) disgorge $840,000 in profits; (ii) a five-year director and officer bar; and (iii) a five-year penny-stock offering bar. *Id.* ECF No. 34. In other words, setting aside the truth of the 2005 allegations, Bauer had known for nearly a decade before the conduct charged in this case that the U.S. authorities would seek to hold him accountable for financial misconduct he committed in our securities markets from abroad. That did not stop him from engaging in the crimes in this case. More than many defendants, a significant incarceratory sentence is necessary to specifically deter Bauer from returning to a life of financial crime that preys on innocent U.S. investors.

General deterrence is also important here. *See* 18 U.S.C. § 3553(a)(2)(B). The Second Circuit and courts in this district have noted the appropriateness of significant sentences in the context of financial crimes, including specifically pump-and-dump schemes, committed by defendants who make the calculation that white collar crime is "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense). And, as the Eleventh Circuit has noted, in passing the Sentencing Reform Act, "Congress was especially concerned that prior to the Sentencing Guidelines, [m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *see also id.* ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.").

For those reasons, it is important here to impose a sentence that will deter future insider trading. While a "relatively modest prison term" may be sufficient in some cases, non-incarceratory sentences "totally fail to send this message." *United States Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014). The potential messages that could be inferred from this case, depending on the sentence, illustrate the point. If, on the one hand, Bauer is sentenced to a term of incarceration, and one commensurate with the defendant's conduct, it will send a message to other individuals engaged in market manipulation that pump-and-dump schemes will result in prison time. But, on the other hand, a noncustodial or brief sentence may result in the wrong message: that pump-and-dumps are not serious or, even worse, that wealthy individuals connected to these global criminal enterprises like Blacklight are able to reap the

benefits of their crimes and connections and escape meaningful consequences. The fact that this case has resulted in press coverage (Def. Br. at 25-26) does not alone serve a deterrent purpose. *United States v. Cutler*, 520 F.3d 136, 171 (2d Cir. 2008). Instead, "because the case had attracted an unusually large amount of publicity," it "could have a powerful general deterrent effect." *United States v. Ulbricht*, 858 F.3d 71, 94 (2d Cir. 2017).

### C. A Significant Incarceratory Sentence Is Also Necessary to Avoid Unwarranted Sentencing Disparities

Relative culpability and the defendant's personal characteristics also warrant a substantial incarceratory sentence, albeit one below the Guidelines range. "In imposing a sentence, the district court is required to consider, among other things, 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008) (quoting 18 U.S.C. § 3553(a)(6)). As the Second Circuit has repeatedly observed, however, sentencing disparities are not "unwarranted" where defendants are not "similarly situated." *United States v. Wills*, 476 F.3d 103, 109-10 (2d Cir. 2007).

Here, when comparing the defendant's case to other pump-and-dump defendants in this District, the need to avoid unwarranted sentencing disparities requires the imposition of an incarceratory sentence within the Guidelines Range. Pump-and-dump defendants are generally sentenced to prison. *See, e.g.*, *United States v. Watts*, 2025 WL 444047 (2d Cir. Feb. 10, 2025) (affirming, after remanding for substantively unreasonably low sentence of one year and one day, 60-month sentence for boiler room pump-and-dump defendant); *United States v. David Levy et al.*, 11 Cr. 62 (PAC) (sentencing $20 million pump-and-dump organizer to 108 months' imprisonment and co-conspirators to, *inter alia*, 60 months' imprisonment, and lesser-role contributors to 12 months' and 6 months' imprisonment);. Indeed, the defendant made millions more than many other defendants in this District who have been sentenced to substantial jail time. *See, e.g.*, *United States v. Chartier*, 2024 WL 3617023 (2d Cir. Aug. 1, 2024) (affirming 120-month and 60-month sentences for boiler room pump-and-dump defendants who obtained approximately $1 million and $781,00, respectively); *United States v. Ingarfield*, No. 20 Cr. 146 (JSR) (defendant who obtained approximately $1.4 million through pump-and-dump scheme in one issuer sentenced to 30 months' imprisonment); *United States v. Zafar*, 291 F. App'x 425 (2d Cir. 2008) (defendant who obtained approximately $900,000 through pump-and-dump scheme sentenced to 57 months' imprisonment); *United States v. Ware*, 577 F.3d 442 (2d Cir. 2009) (defendant who obtained approximately $230,000 through pump-and-dump scheme sentenced to 97 months' imprisonment); *see also, e.g.*, *United States v. Larmore*, No. 24 Cr. 140 (PAE) (S.D.N.Y.) (60-month sentence for tender offer market manipulation).[2]

---

[2] The defendant's counter-examples are generally inapposite. (See Def. Br. at 34-36). For example, in *Naqvi*, the transcript for the sentencing is unavailable, but the defendant's sentence of time served of one year and three months for his participation in a pre-IPO Ponzi scheme appears to have been driven by the fact that the defendant profited only to the tune of a salary of approximately $48,000, that the defendant was incarcerated at the Metropolitan Correctional Center during the teeth of the COVID lockdowns and, and that Naqvi was substantially less culpable than the leader of the scheme, Fred Elm, who misappropriated millions from investors

Bauer's conduct is highly culpable when compared to that of his co-defendants—indeed, it is the Government's position that, of the four charged defendants in this case, Bauer was the leader of the criminal enterprise. To be sure, while others, such as Craig Auringer, played significant roles in Bauer's criminal operation, the Government disputes Bauer's characterization of Auringer as a "essentially a co-equal partner" in the scheme. Based on documentary evidence and witness testimony, it is clear that Bauer retained primary trading authority over all accounts in the Bauer group, including Auringer's. *See, e.g.*, Ex. E (selected chat excerpts). Unlike Auringer, Bauer participated in or directed nearly every aspect of the pump-and-dump operation, from shell acquisition and nominee account creation through promotional campaigns through executing trading strategy and disbursing proceeds. And Bauer often worked with one set of co-conspirators and not others, for example, by partnering with Ferris or Mihaylov without Auringer or Auringer without Mihaylov. In short, for this scheme, Bauer was the central node.

Some of the defendant's personal characteristics militate towards a substantial sentence; others, to be sure, towards leniency. The defendant engaged in this repeated and brazen conduct to fund his lavish lifestyle—luxury homes and villas, international travel, art, jewelry, watches, cars, and so forth—and did so to such access that he has represented to the Government in connection with negotiations over a forfeiture settlement that he is cash and asset-negative and functionally destitute. (PSR ¶ 92; Def. Br. at 5).

At the same time, the defendant's family circumstances appear particularly harrowing at the present moment. While the Government has attempted to accommodate those circumstances in part through extraordinary provisions in the plea agreement, for example, consenting to a substantially delayed surrender date, it would be appropriate for this Court to take into account those personal circumstances in fashioning the appropriate sentence under the Section 3553(a) factors. The same is true the facts Bauer points to regarding the likely circumstances of his incarceration as a foreign national. (Def. Br. at 30-32).

Moreover, unlike many other defendants charged for similar conduct in related cases, Bauer consented here to extradition, saving what may have been years of additional extradition proceedings, and appears to have accepted responsibility for his conduct. His sentencing memo eloquently details his continued efforts to atone and take responsibility for his conduct, and for that the defendant should be commended. But, while the Government believes those factors should be reflected in a below-Guidelines sentence, these efforts do not outweigh the other Section 3553(a) factors in counseling towards a still substantial incarceratory sentence.

---

and who was sentenced to 85 months' imprisonment. *See United States v. Elm et al.*, 16 Cr. 356 (ER) (S.D.N.Y.) (ECF Nos. 83, 85, 104).

## IV. Conclusion

For the reasons set forth above, the Government respectfully submits that a below-Guidelines sentence of 48 months' imprisonment would be sufficient but not greater than necessary to comply with the purposes of sentencing.

Respectfully submitted,

JAY CLAYTON
United States Attorney

by:     /s/                              
    Jason Richman
    Matthew R. Shahabian
    Vladislav Vainberg
    Assistant United States Attorneys
    (212) 637-2589/-1046/-2589