**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

RONALD BAUER,

                Defendant.

No.  **1:22-cr-00155-PAE**

**REDACTED VERSION
FOR PUBLIC FILING**

<u>**RONALD BAUER'S SENTENCING MEMORANDUM**</u>

Aaron M. Katz
AARON KATZ LAW LLC
399 Boylston Street, 6th Floor
Boston, MA 02116
(617) 915-6305
akatz@aaronkatzlaw.com

1

## TABLE OF CONTENTS

I.      INTRODUCTION…………………………………………………………...1

II.     DISCUSSION OF THE § 3553(a) FACTORS…………………………….…..5

        A.  Ron's Personal History and Characteristics………………………………6

        B.  The Nature and Circumstances of the Offense………………………….…..19

        C.  The Need for Punishment and Deterrence…………………………………23

        D.  The Kinds of Sentences Available………………………………………28

        E.  The Applicable Guidelines Range………………………………………29

        F.  The Need to Avoid Unwarranted Sentencing Disparities……………………..30

III.    CONCLUSION……………………………………………………………..36

# I.    __INTRODUCTION__

Ron Bauer is a good father, husband, son, friend, and neighbor.  He is genuine, kind, charitable, and strives to bring joy and happiness to others.  The ***over four dozen*** letters of support that have been submitted on Ron's behalf, some of which are from Ron's family members and closest friends but many of which are not, unambiguously attest to this.

Ron is not perfect, of course.  Nobody is.  Like any human, Ron has erred.  More than a decade ago, Ron made a series of bad decisions that he self-corrected, that he deeply regrets, and for which he is deeply remorseful.  Although the government has not identified any victims who lost money as a result of Ron's offense conduct, Ron acknowledges that this is irrelevant to his guilt.  Ron knew what he was doing was wrong, and he should not have done it.

Ron takes full responsibility for his past criminal actions.  After securing agreement on a bail package that would allow him to remain in London to be with his wife and kids after arraignment, Ron consented to his extradition to the United States.  Despite his defense counsel imploring him that he had a triable case, Ron elected to plead guilty and own up to his wrongdoing in an eloquent plea colloquy that he authored himself.  Ron has been forthright with his family and friends about his guilt.[1]  And he has publicly acknowledged his conduct with extraordinary and unusual transparency, hoping that by telling his story he might help others avoid making the same or similar mistakes.[2]  Ron now stands humbly and solemnly before this

---

[1] *See, e.g.,* Exh. A, Letter from ███████████ ("[Ron] owns his mistakes and actively works towards making amends.  He hasn't done it because he was ordered by Your Honor or any other individual; he's done it because he's a man of integrity and wants to make things right."); Exh. B, Letter from ████████ ████████ ("Ron has talked openly with us about his case and what he could have done differently.  Not once have we heard him make excuses or blame other people for his legal situation.  He has accepted responsibility for his actions and has shown remorse.").

[2] *See, e.g.,* Exh. C, Letters from Professor ████████ (discussing the presentation Ron provided to Professor ████'s class at ██████████, during which Ron openly discussed his case as a cautionary tale about the consequences of engaging in unethical business conduct).

Court for sentencing, accepting of whatever punishment the Court in its wisdom believes is just. Ron is fearful of the additional collateral damage that his sentence will inflict on his wife and kids, yet hopeful that the Court will grace him and his family with mercy.

Ron is not remotely the same man today that he was a decade ago, when he foolishly (and needlessly) cut corners that he should have turned squarely. Ron righted his ship in 2017, five years before he was indicted and long before he had any inkling that he or any of his coconspirators might be under investigation. Nobody forced him to do so. Ron did it on his own accord. Ron righted his ship because he was ashamed at the person he saw in the mirror; ███████████████████████████████████████████████████████; ███████; ███████████████████████████████████████████; because he wanted to be a proper role model for his sons ████ and ████ who were small children at the time and are adolescents now; because he wanted his father, who sadly died of cancer in July 2023 without Ron able to be present, to be proud of him; and because he knew it was simply the right thing to do.[3] Ron's early, proactive atonement does not provide him a free pass for his past actions. But it does distinguish Ron from the overwhelming majority of white-collar offenders, who express remorse only after they get caught.

There are other important distinctions between Ron's case and the typical microcap securities fraud that results in criminal prosecution. Ron's offense conduct did not involve the promotion of fake companies with pretend businesses. It did not involve serial wash trading to create the illusion of buying liquidity and to manipulate the price of the stocks higher and higher. It did not involve boiler rooms or the targeting of vulnerable victims. And it did not involve dumping on unsophisticated retail traders shares that Ron believed were worthless. Instead, the

---

[3] *See* Exh. D, Letter from Ron Bauer.

gravamen of Ron's offense conduct was using nominee entities to hide from the SEC—and therefore from investors who might review issuers' Schedule 13D and Section 16(a) filings as part of their investment diligence—his beneficial ownership of the issuers' shares. The issuers were fledgling companies with real businesses that Ron believed held real promise.[4] Was Ron's hiding of his beneficial ownership a criminal violation? Yes. But was it in the heartland of securities fraud offenses that the Sentencing Commission had in mind when it fashioned the Sentencing Guidelines? No.

This prosecution already has inflicted severe, crippling consequences on Ron and his family. Since the unsealing of the indictment in April 2022, Ron has lost his career and his professional reputation. Ron has been unable to earn meaningful income for over three years and has depleted his savings on legal fees incurred in criminal and civil proceedings in the United States and England. ███████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████. Restricted from traveling outside London while he sought to negotiate the terms of his extradition, Ron could not be by his father's side in Toronto while he lay dying from an aggressive form of rapid-onset pancreatic cancer, and Ron also was unable to attend his father's funeral. For Ron, no punishment could be greater than being unable to kiss his father goodbye and to honor his father at his funeral.[5] Ron still has not forgiven himself for this. ████

---

[4] *Id.*

[5] *See* Exh. E, Letter from Rabbi ████ ████ ("Ron was denied the right to visit his father on his deathbed and say a final goodbye. . . . I witnessed firsthand the physical, psychological and personal distress [Ron] went through by missing out on [this opportunity]."); Exh. F, Letter from ████████ ("[Not being able to say goodbye to his father was] the ultimate punishment for a family that is so close and for a son that loved his father so very much.").

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

    For the past three years, Ron has had every excuse to fall into a dark psychological abyss.

Instead, he has met the moment. ████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████ He has given guest

lectures about his case and conduct at several American universities (including ████████ and

████████), hoping that the poor decisions he made in the past can serve as a cautionary tale for

students about how they should conduct themselves in the business world and in life.[7] Ron also

has doubled down on his charitable activities, including using his business expertise to help

justice-impacted individuals in under-served communities launch companies of their own.[8] Most

important, Ron has renewed his concentration on the roles he cherishes most: being a deeply

committed husband to ████████ and father to their sons ████ and ████ and a loving and attentive

son to his ailing 78-year-old mother ████.

    The Sentencing Guidelines, with its cold and rigid calculus, says that Ron should receive

a sentence of 60 months' imprisonment. Ron's probation officer Robert Flemen recommends a

---

█ ████████████████████████████████

[7] *See* Exh. H, Letter from Professor ████████████ ("I am now a member of the accounting faculty at ████████ University, where I arranged for Ron to speak to my business ethics students about his story. . . . Ron's presentation was powerful, instructive, and resonated with my students. Ron spoke from the perspective of a successful businessperson who learned the lesson of taking ultimate responsibility."); Exh. I, Letter from Professor ████████ ("[Ron] was willing and eager to share his experience as a cautionary tale to my students [at ████ University], who appreciated his honesty and transparency. . . . I believe the students really took Ron's lessons to heart because of how sincerely he discussed his behavior and the consequences of his actions.").

[8] *See* Exh. J, Letter from ████████; Exh. K, Letter from ████████.

36-month term of imprisonment, reflecting Mr. Flemen's opinion that Ron's advisory Guidelines range drastically overstates the seriousness of Ron's offense.  We respect Mr. Flemen's recommendation, but we believe a sentence of 36 months' imprisonment, though a downward variance, still would be far greater than necessary.  For the reasons described in more detail below, we believe that a sentence of probation would be sufficient to fulfill the goals and purposes of criminal punishment and would not create any unwarranted sentencing disparities. If, however, the Court believes that a term of imprisonment is necessary, we believe that Ron's sentence should be substantially shorter than 36 months and, in addition, that the Court should provide Ron a delayed reporting date consistent with the terms of his plea agreement.  Moreover, if the Court imposes a term of imprisonment, we ask that Ron's sentence also include a period of supervised release, so that Ron might qualify for First Step Act credits.[9]

## II.     DISCUSSION OF THE SECTION 3553(a) FACTORS

Criminal sentencing is a uniquely individualized exercise.  "No chart of numbers will ever fully contemplate, quantify and cipher the endless variations of the human experience," and a court cannot "reduce justice to a universal formula."  *United States v. Davis*, No. 07-cr-727, 2008 U.S. Dist. LEXIS 44030, at *11 (S.D.N.Y. June 5, 2008) (internal quotation marks omitted).  The "'overarching' command of § 3553(a) is the Parsimony Clause, which 'instruct[s] district courts to impose a sentence sufficient, but not greater than necessary, to accomplish the goals of sentencing.'"  *Id.* at *11-12 (quoting *Kimbrough v. United States*, 552 U.S. 85, 101 (2007)).  We respectfully submit that a holistic consideration of all the § 3553(a) factors

---

[9] Probation recommends that the Court not include any supervised release as part of Ron's sentence.  We believe Probation may have overlooked that omitting supervised release from Ron's sentence would disqualify Ron from receiving First Step Act credits and thus effectively increase the severity of any prison sentence that the Court might impose.

demonstrates that probation or, alternatively, a term of imprisonment substantially shorter than 36 months is appropriate for Ron.

### A.    Ron's Personal History and Characteristics

A man is more than his worst decisions.  That is profoundly true of Ron.  Shaped and scarred by family tragedies, Ron is a good and kind man who has lived a life of generosity and charity.  As the letters of support attest, and for the reasons described herein, Ron is the type of person who is deserving of the Court's leniency and mercy.

#### 1.    Ron's Childhood in Toronto

Ron was born in Toronto in 1975.  Ron's parents, both of whom were born in Romania and were children of Holocaust survivors, worked full-time jobs.  Ron's mother owned a restaurant.  Ron's father worked in real estate.  Their hours were long, and so Ron often was left in the care of his older siblings—two brothers and a female cousin whom Ron's parents adopted after her parents were killed in a tragic car accident.  Ron and his siblings were tightly bonded, and Ron's siblings were his best friends growing up.

The defining event of Ron's childhood was a tragedy that occurred on New Year's Eve in 1985, when Ron was almost ten years old.  ██████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████ █████ cracked the foundations of the family.  Ron's mother fell into a deep depression.  She closed her restaurant and dealt with her depression by sleeping most of the day.  When she was awake, she was not the happy person she once was and openly expressed thoughts of suicide.  Ron's father dealt with his own depression by burying himself in his work, causing Ron to feel estranged from his father at a time that Ron needed him

most.  Seeking to escape the constant reminders of ███████, Ron's parents abruptly moved

the family to a new home.[10]

███████ devastated Ron, but his parents' own battles with depression over the event

prevented Ron from properly grieving.[11]  Instead, Ron "suffered in silence" and, despite being a

young boy, strove to become his grieving mother's emotional caretaker—a role he continues to

play today.[12] ████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████

### 2.    Ron's Transition to Adulthood in Israel

In 1992, when Ron was a rising high school senior, his father took a new job in Israel.

Ron moved with his mother and father to Jerusalem, abruptly leaving behind the world he knew

in Canada.  Being the new kid in school in a new country at age 17 was not easy, and Ron

struggled with depression and anxiety. ██████████████████████

████████████████████████████████████

██████████████████

---

[10] *See* PSR, ¶¶ 65-69.

[11] *See* Exh. F, Letter from Martha Bauer ("Ron was 10 years old at the time and took the loss of his brother very hard. When I look back all these years, I wonder if my husband and I could have done things differently. We never thought about therapy or counselling for Ron and his brother. This was not something you did, and we did not want the children to be looked at differently at school or in the community because they were receiving psychiatric care or psychological counselling. We just pushed on.").

[12] Exh. L, Letter of Daniel Bauer.

█████████████████████████████████████

████████████████████████████████████

After graduating high school, Ron enrolled at the ███████ University ████████,
majoring in business. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████ he dropped out of university a couple semesters short of graduating.[14]

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ ██████████████████████████████████████████████████████████

████████████████████████████████████████████

### 3.       Ron's Success in the Business World

In 2000, Ron left Israel for London.  With global equities markets still running hot, Ron
found work in the fast-paced world of start-up technology companies and early-stage investing.
He enjoyed the intellectual challenge, and Ron's gregarious personality endeared him to his
business colleagues and potential clients.  Ron quickly became a successful adviser to young
companies seeking to tap the public markets.  In 2002, Ron moved from London to Miami and
then, in 2003, moved to Vancouver.  A year later, Ron started his own firm, Theseus Capital,
which focused on helping early-stage companies access growth capital.  Theseus had several
major success stories, including guiding Turkana Energy's multi-billion-dollar acquisition by

---

[14] The University of ████████ later permitted Ron to enroll in its Master of Business Administration
program based on Ron's professional accomplishments, notwithstanding that he lacked an undergraduate
degree.  Ron earned his master's degree in 2012.

[15] *Id.*

Africa Oil.  After Ron moved back to London in 2010, Theseus guided several technology,

biotechnology, and energy companies' initial public offerings on the NASDAQ, NYSE

American, and London Stock Exchange.  Ron was not just a peripheral advisor to the companies

but rather was so integral that he was considered a co-founder and trusted advisor to the

management and boards of directors.[16]

Executives with whom Ron worked noted that Ron, unlike so many others in the capital

markets, was more interested in their companies' success than with his own compensation.[17]

Ron even offered his assistance and expertise, in urgent circumstances, without asking for any

compensation at all.  ███████████████, for example, recalls how Ron helped his company

███████ "secure short-term financing" after an anticipated sale of the company fell through at

the last minute during the Christmas holiday break in 2021.  Ron jumped in to help immediately,

and his assistance saved the jobs of more than two dozen employees, as well as shareholders'

investments.  Yet, Ron "never asked for any remuneration and indeed told ████] not to offer

him any as he was more than happy to help a friend in their time of need."[18]

Although the indictment against Ron relates to a period during which he was working

with companies that listed on the over-the-counter markets, beginning in 2017 Ron turned his

---

[16] See, e.g., Exh. O, Letter from ██████████████████████████████ ("Ron Bauer was one
of the co-founders of [████████]. . . . He went beyond his role as a founding shareholder and his work was
vital in the company's development and growth.  Not a single shareholder other than Ron provided such a
substantial level of hands-on assistance to me or the company.  He was instrumental in getting the
company ready for primetime and successfully launching an IPO.").

[17] See Exh. P, Letter from ████████████ ("Every banker we met, and advisor was trying to take
advantage of us, charge us extortionate advisory fees or blatantly force us into a bad deal.  Ron[,
however,] was like a blessing to us. . . . Ron put together a rockstar team that helped us take our company
. . . to an IPO within 7 months raising close to $50 million between our IPO and secondary placement. . . .
Ron never took a penny of compensation.  He never put his hand in anyone's pocket.").

[18] Exh. Q, Letter of ████████████.

focus exclusively to companies that were listed or would be seeking to list on major exchanges, such as NASDAQ, NYSE American, or London Stock Exchange.  Companies that Ron has helped take public on those exchanges since 2017 include ████████████ (NASDAQ), ████████ (NASDAQ), ████████████ (LSE), and ████████████ (LSE). ████████████, one of the original founders of ████, has worked with Ron for nearly a decade and describes Ron as having "a keen ability to identify promising technologies and turn them into successful business ventures. . . . He has the potential to continue making significant contributions to our economy and to further strengthen America's position as a global leader in technology and innovation."[19]

      Executives with whom Ron has worked closely since 2017 attest that Ron is highly ethical and highly trustworthy.  For example, ████████████, a successful entrepreneur who has worked with Ron for over ten years, describes Ron as a "visionary" who "[e]mphasizes responsible business practices, balancing profit with purpose." ████ says that he has "never witnessed any untoward conduct from Ron in any shape or form" and that his "experiences [with Ron] have only been positive in every way."[20] ████████████, the founder of ████████ ████████, similarly says that his "experiences with Ron have been entirely positive" and that the charges against Ron "starkly contrast with" the Ron whom he knows.[21] ████████████, the founder and CEO of ████████████, which Ron helped take public on NASDAQ in 2021, writes: "Ron is honest and hardworking.  I've never seen him suggest or work in any capacity that promoted non-compliance or illegal practices. . . . From what I know and have

---

[19] Exh. R, Letter from ████████████.

[20] Exh. S, Letter from ████████████.

[21] Exh. T, Letter from ████████████.

seen, Ron has always behaved according to the highest standards."[22]  These attestations, from

people whom have nothing to gain by being in Ron's corner at this difficult hour, demonstrate

that Ron is a fundamentally different person than he was a decade ago, when he made the bad

decisions for which the Court is now sentencing him.

### 4. Ron's Charity, Generosity, and Genuine Care for Others

As Ron achieved success in the business world, he recognized a moral responsibility to

give back to his community.  Ron has participated in secular and religious charitable endeavors

for over a decade.  Rather than just donate money, Ron and ███████, working as loving

teammates, have dedicated their time and energy to causes in which they believe.  Since 2013,

Ron and ███████ working as a team, have helped to raise over £3 million for the ███████

███████ Hospital, which essentially is the United Kingdom's version of the United

States's St. Jude Children's Research Hospital.  Ron and ███████ also have volunteered their

time and resources to philanthropic organizations such as ███████ Foundation; ███████

███████ and the ███████ Trust, which supports social programs for underprivileged

youths across England.[23]

Since his indictment, Ron has devoted himself to organizations that help prepare criminal

offenders for life after prison, including the ███████ and ███████

mentorship programs and the ███████ As part of these organizations, Ron

---

[22] Exh. O, Letter from ███████; Exh. U, Letter from ███████ (former Chief
Operating Officer of ███████, who writes that "the man I know has always operated with
the highest integrity").

[23] *See* Exh. V, Letter from ███████ (███████); Exh. W, Letter from ██ ██ (███████
Foundation); Exh. E, Letter from Rabbi ███████ (███████ Exh. X, Letter from ███████
███████ (noting Ron's contribution to "causes and initiatives across Africa," including "projects
focused on education, healthcare access, and sustainable development").

has mentored offenders who desire to start their own small businesses after being released from prison, helping them to develop their business plans and advising them on how to raise capital.[24]

████████'s founder ████████, who served a significant prison sentence for drug crimes prior to founding ██████, describes Ron as a "mentor[ ] . . . who [has] contribute[d] [his] time and soul" to ██████'s mission. In addition to Ron's involvement in ██████, ██████ writes that Ron "has been actively involved with organizations like ██████████ and ██████████, which provide grants and mentorship to ex-offenders starting businesses." ██████ further writes that "Ron Bauer is one of those people who in the face of adversity was thinking about helping others over himself" and that Ron's "advocacy for justice initiatives like ██████ has changed him as a person and has benefitted countless people in our community."[25]

Ron's generosity extends well beyond the type of formal charitable endeavors that warrant inclusion on a curriculum vitae. Ron's generosity also is reflected in the things he does for people without any fanfare. If there is a common thread in the letters of support provided by Ron's friends, family members, and business colleagues, it is that Ron is always thinking of others, particularly during their times of need.[26] Ron's friend ████████ describes Ron as "a

---

[24] *See* Exh. K, Letter from ████████ ("[Ron's] work has benefitted countless individuals, and he has consistently used his personal platform to mentor young professionals and those from disadvantaged backgrounds," especially "those in the Justice Impacted Community who are often overlooked and cast aside by society."); Exh. J, Letter from ████████ ("Ron Bauer is one of those people who in the face of adversity was thinking about helping others over himself. His advocacy for justice initiatives like ██████ has changed him as a person and has benefitted countless people in our community."); Exh. Y, Letter from ████████ ("[Ron] has had phone calls and video calls with . . . others going through the throes of the criminal justice system, offering them his experience, strength and hope."); Exh. Z, Letter from ████████ ("Thanks to your efforts, we're able to provide ongoing, self-directed educational programs to more than 1 million people in jails and prisons across the United States. They are building pathways to return to society as law-abiding, contributing citizens.").

[25] Exh. J, Letter from ████████.

[26] *See, e.g.*, Exh. A, Letter from ████████ ("He's someone we can always count on, and we've only seen that increase since his case began. Last year, ██████ had a pretty serious operation and Ron kept calling and texting to see how he was doing."); Exh. Q, Letter from ████████ (writing that

man of great character" who "consistently demonstrates kindness and thoughtfulness toward those around him."[27]  Several specific examples stand out from the letters of support that have been submitted on Ron's behalf.  These examples are not mere heartwarming anecdotes.  They are the truest reflection of the type of person that Ron is—someone who goes out of his way to help others even when nobody is watching.

The first example comes from ██████████, who served as the Bauers' nanny for many years.  ██ is from the Philippines.  When ████ started working for the Bauers, her husband and daughter were still living in the Philippines.  Ron could see that ████ missed her husband and daughter terribly.  One day, without prompting, Ron told ████ that he wanted to sponsor her husband's and daughter's petitions to immigrate to the United Kingdom.  Ron organized and paid for immigration attorneys to complete the necessary paperwork, and he served as the immigration petitions' sponsor.  As a result of Ron's efforts, ████s husband and daughter received permanent residency status, which eventually led to them receiving full UK citizenship. ████ says that Ron always has treated her like family and that she is "eternally grateful" for Ron's efforts, "because very few others would have done that."[28]

A second example comes from Ron's and ████████ friend ████████████.  Shortly after Ron's indictment, ████ was going through a "traumatic time in [her] life."  She was "facing a situation [she] never could have imagined."  To help relieve ████'s burden, Ron "took ████'s]

_____

Ron offered ████'s family use of the Bauers' vacation home when ████ could not otherwise afford to take his family on holiday).

[27] Exh. BB, Letter from ████████.

[28] Exh. CC, Letter from ████████.

children on as his own, engaging them in all topics ranging from social to academic with wholehearted advice at times when they needed it most."[29]

A third example is offered by ███████ parents ████████████. The Bauers' beloved dog Ernie was very sick, and his back legs were no longer working. Several veterinarians suggested euthanizing Ernie. Knowing how important Ernie was to the family (especially ███ and ███ Ron refused to accept that nothing could be done. Ron looked high and low for a specialist until he finally found one who agreed to perform surgery on Ernie. The surgery was successful, and Ernie lived several more good years.[30] It is often said that, if you want to know whether a man has a good heart, look at how he treats animals. Ron's compassion for Ernie showed that Ron has a heart of gold.

A fourth illustrative example comes from Ron's friend ██████. In 2021, ███'s fiancé █████████████████████. Ron went above and beyond in supporting ███ through that "very difficult time." Ron offered ███ use of his home so that ███ could "get away and have some peaceful time to reflect." This "played a big part in helping [███] move forward with [his] life, which is something ███ will] never forget."[31]

### 5. Ron's Love for His Wife and Children

Ron's success in the business world brought him money, but starting a family of his own is what has brought Ron true joy. Ron met ███████ ████, a British citizen, in London in 2001. Ron and ██████ quickly fell in love and married in 2004. Ron and ██████ are a true yin-yang couple, with ██████ preternaturally calm demeanor perfectly balancing Ron's

---

[29] Exh. DD, Letter from ████████.

[30] *See* Exh. EE, Letter from ████████.

[31] Exh. FF, Letter from ██████.

boisterous personality. ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████ Ron's deep love and affection for ██████████ is obvious to those

around them, and it creates a warmth that resonates throughout their home.  Ron's and

███████████ marriage is a loving relationship between true life partners who treat each other as

equals—the type of marriage we should all strive to achieve.[32]  Friends say there is a "natural

kindness" to the way Ron and ████████ live their lives, and friends describe their home as "one

of the most welcoming places" they know, the "kind of home that quietly affirms the goodness of

community and strength of family."[33]  One letter that stands out is from Ron's friend ██████

████████, ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████ Ron, however, "went out of his way to [invite

████████ and his family] places.  He welcomed [████████ and his family] into [the Bauers'] home

and really made [them] feel comfortable ████████████ . . . . [Ron] really gave ████████ and his

wife] a safe place ███████████████████████████."[34]

    A parent's greatest success is his children, and that certainly is true for Ron and ██████████.

Their first child, ██████ was born in January 2009, and Ron and ██████████ moved back to London

shortly thereafter.  Their second child, ██████ was born in March 2011.  Through thick and thin,

Ron has been a dedicated father.  Ron has been active in his sons' academics, regularly attends

their school events, rarely misses a sports match, and sets aside quality time to for each of them.

---

[32] *See, e.g.*, Exh. AA, Letter from ████████ ██████ ; Exh. Q, Letter from ████████████████ .

[33] *See, e.g.,* Exh. GG, Letter from ██████████████████ .

[34] Exh. HH, Letter from ██████████████ .

Friends describe Ron as a "remarkably loving and present father."[35]  Ron "takes his boys everywhere with him" and spends "as much time as he can with them."[36] ▮ describes Ron as "the best partner in everything," the person who supports him "on a deeper level," and "the first person [he goes] to" when he needs to "talk about [his] feelings."[37] ▮ describes Ron as "one of those genuinely amazing people who always raises the mood of a room" and "a very caring person" who is "always there to help [▮ with anything [he has] going on at school, be it music recitals, exams or most importantly, sports matches."[38]

Ron is a spiritual person who is proud of his Jewish heritage.  Friends describe Ron as "a pillar of our Jewish community" who is "deeply involved in community life at ▮ ▮ and "always striving to bring people together and uphold the traditional Jewish values that we share."[39]  He has passed those values down to his sons. Ron, ▮ and ▮ regularly attend synagogue at ▮ together, and the family is active in ▮ related charitable endeavors.[40] ▮ and ▮ are kind, thoughtful, and polite teenagers who are excelling in school and have promising futures ahead of them.[41] ▮ and ▮ adore Ron, and

---

[35] *Id.*

[36] Exh. CC, Letter from ▮.

[37] Exh. II, Letter from ▮.

[38] Exh. JJ, Letter from ▮.

[39] Exh. KK, Letter from ▮.

[40] *See* Exh. X, Letter from Rabbi ▮.

[41] *See, e.g.,* Exh. W, Letter from ▮ ("Both ▮ and ▮ had exemplary careers as pupils at the school . . . ."); Exh. Q, Letter from ▮ ("[Ron] has been a tremendous father and role model for his two sons ▮ and ▮ both of whom are lovely boys who excel at everything they do."); Exh. LL, Letter from ▮ ("[Ron's] boys are a true testament to the values and character he and his wife, Sam, have instilled in them.  They are bright, well-mannered, and kind young men, both excelling at St. Paul's, not because they were handed everything, but because they were raised with strong principles and a deep sense of responsibility.").

they are unsure how they will manage if Ron is sentenced to a term of imprisonment 4,000 miles

away from London.[42] ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

      Being a father has been Ron's greatest honor, and it has been transformative in ways that

he did not expect.  In addition to giving Ron a greater purpose, it helped Ron repair his

relationship with his own father Joseph.  After ████████████████████████, Ron's

relationship with his father had become distant and strained.  That changed after ████ was born.

After ████s birth, Ron became so close with his father that, up until his father's death in July

2023, Ron considered his father to be his best friend.  Though separated by an ocean after Ron

and ████████ moved back to London in 2010, Ron spoke to his father by phone several times

per day and would travel back to Toronto to see his parents several times per year.

      **6.**    ███████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[42] *See* Exh. II, Letter from ████ ████; Exh. JJ, Letter from ████ ████.

██ ████████████████████████████████████





**B.     The Nature and Circumstances of the Offense**

A prototypical pump-and-dump scheme involves "hiring stock promoters to circulate articles containing false statements about [the company's] prospects." *SEC v. DeFrancesco*, 699



F. Supp. 3d 228, 236 (S.D.N.Y. 2023).[52]   Another common feature of a criminal pump-and-dump scheme is the use of "match trades . . . designed to create the appearance of active market interest in [the company's] stock, upward momentum in the stock price, and on many occasions, to set the closing price of the stock.  This pattern of pre-promotion trading activity, often referred to as 'building the chart,' is a typical step undertaken by fraudulent actors prior to a pump and dump scheme."  *SEC v. Sripetch*, No. 20-cv-01864, 2024 U.S. Dist. LEXIS 237297, at *9 (S.D. Cal. Feb. 6, 2024).  Pump-and-dump schemes also commonly involve "boiler room" operators "hard-selling the issuers' stock" to vulnerable victims through "false representations."  *SEC v. Biller*, 654 F. Supp. 3d 212, 213 (S.D.N.Y. 2023).

The parties' agreed-upon statement of facts of Ron's offense conduct—which the parties arrived at as a result of extensive, cooperative, and good-faith review and discussions of the evidence—describes a scheme that, though undoubtedly criminal under Second Circuit precedent, was much more benign than a prototypical pump-and-dump.[53]  Several aspects of the agreed-upon statement of facts demonstrate that Ron's offense conduct was far less aggravated than the type of pump-and-dump scheme that is in the heartland of § 2B1.1 of the Sentencing Guidelines.

---

[52] In *DeFrancesco*, for example, the defendants arranged for the publication of an article stating that the company "plan[ned] to open seven more new stores in the coming year in different cities across Argentina," an assertion that lacked any factual basis.  *Id.*  The same article stated that the company would provide "yields of 8% to 9%," despite the fact that the company "was never actually profitable . . . ."  *Id.*  The defendants' articles "were littered with other false or misleading statements" about the company's business operations, including a completely invented claim that its "stores earned revenue of $3,750 per square foot" and a baseless assertion that the company earned $900 million in revenue during the prior year.  *Id.*

[53] The agreed-upon statement of Ron's offense conduct is attached to Ron's plea agreement and recited essentially verbatim in paragraphs 14-34 of the PSR.

**First**, the issuers involved in Ron's offense conduct were real companies with real management, real assets, real business operations, and real potential. Ron believed in the companies' potential. Ron did not disseminate or direct others to disseminate false statements of fact about the issuers' business prospects. To be sure, the promotional materials were replete with puffery that focused exclusively on the issuers' upside potential (which was real), while eliding any discussion of the risk that the issuers would fail to execute on their business plans. That, however, did not make the promotional materials criminally false; it simply made them biased. **Second**, although the agreed-upon statement of facts describes a few isolated instances of match trades that Ron authorized, those match trades involved such small volumes, were so infrequent, and occurred at such inopportune times that they cannot fairly be construed as attempts to "build the chart" for a pump-and-dump. **Third**, the agreed-upon statement of facts does not reflect Ron's participation in a boiler room, hard-selling, or targeting vulnerable victims. This likely explains why the government has not identified any actual victims of Ron's conduct and why no victims have stepped forward. **Fourth**, the agreed-upon statement of facts reflects that Ron did not "dump" all his shares of the issuers' stock as the price of the shares appreciated in the wake of the promotional campaigns. The agreed-upon statement of facts instead shows that Ron held a significant percentage of his shares for an extended period of time, including through substantial drawdowns, which demonstrates that Ron honestly believed in the issuers' potential (otherwise he would have sold all his shares either during the initial price appreciation phase or shortly after the share price began to meaningfully recede from its highs).

What made Ron's conduct criminal was his use of nominee entities to evade and fail to comply with the SEC's beneficial owner reporting requirements. If Ron had filed with the SEC the requisite public disclosures that he was the beneficial owner of more than 10% of the issuers'

common stock, Ron arguably would have been in full compliance with the federal securities laws. To be clear, we do not dispute that Ron's conduct satisfies the elements of conspiracy to commit securities fraud. Ron willfully failed to disclose to the SEC information that he was legally required to disclose. Ron understood that a hypothetical investor reasonably could have considered that information to be material to his or her investment decisions. Ron also knew his failure to file the requisite beneficial owner disclosures could make it more likely that the promotional materials touting the issuers' stock—materials that, again, we do not believe contained any false statements of fact regarding the issuers' businesses—would be successful in stimulating investor interest. Ron's evasion of the SEC's beneficial owner reporting requirements thus satisfied the legal definition of fraud. That being said, we believe Ron's offense conduct falls well outside the heartland of pump-and-dump scheme that traditionally has been criminally prosecuted as securities fraud, as opposed to pursued as a civil regulatory enforcement matter.

A fair assessment of the nature and circumstances of Ron's offense conduct must also give weight to the fact that, in February 2017, long before Ron had any suspicion that he or his coconspirators might be under investigation, Ron withdrew from the scheme and essentially left the over-the-counter penny stock world behind. Ron withdrew from the scheme shortly after learning that a would-be coconspirator planned to use a boiler room to promote the stock of Cyberfort, a company that Ron believed to be a sham. This did not sit right with Ron, and it was his wake-up call. Ron admitted to himself that he was associating with the wrong people, had been doing things the wrong way, was ashamed at his conduct, did not need to conduct business that way to succeed, and needed to return to the straight and narrow. As Ron acknowledged at his plea colloquy:

> In early February 2017, I was remorseful, I was ashamed of myself,
> and I was guilt-ridden. I changed my behavior more than five years
> before I was indicted and before I even knew there was an
> investigation. I changed my behavior because I knew it was wrong.
> This was not how I wanted to operate or live my life.

ECF No. 48, at p. 32. From that point forward, Ron never again used the Blacklight platform,

never again used a nominee entity to evade the SEC's beneficial owner reporting requirements,

and never again participated in the promotion (truthful or otherwise) of a penny stock trading on

the over-the-counter market. That Ron's conscience ultimately prevailed, and that he never again

engaged in the conduct for which he now stands before the Court, is an integral part of the nature

and circumstances of Ron's offense. We respectfully submit that Ron's self-correction justifies a

sentence of probation or, at a minimum, a term of imprisonment substantially shorter than the 36

months that Probation recommends.

### C.    The Need for Punishment and Deterrence

Section 3553(a)(2) recognizes that a criminal sentence should reflect the seriousness of

the offense, provide just punishment for the defendant's conduct, afford adequate deterrence, and

promote respect for the law. *See* 18 U.S.C. § 3553(a)(2). Here, we believe those considerations

justify either a sentence of probation or a term of imprisonment that is substantially shorter than

the 36 months that Probation recommends.

Ron's evasion of the SEC's beneficial owner reporting requirements satisfied the

elements of the conspiracy charge to which he pled guilty, but, as stated above, we think Ron's

offense conduct was far less aggravated than conduct that is within the heartland of § 2B1.1 of

the Guidelines. The gravamen of Ron's offense conduct was an evasion of the SEC's beneficial

owner reporting requirements. The issuers that Ron and his coconspirators promoted were real

companies, with real management, real assets, and real potential. The promotional materials that

Ron authorized for distribution certainly were filled with puffery, could have better disclosed the

high-risk nature of the issuers' stock (even if those risks likely were obvious to any investor with

a modicum of education and experience), and should have been more transparent that the

promotions were being funded by insiders who held a significant percentage of the issuers' stock.

But the promotional materials did not contain outright false factual statements about the issuers'

business operations, nor did Ron or his coconspirators promote the issuers' stock through boiler

rooms or other hard-selling tactics.  Moreover, although Ron personally realized approximately

$4 million from his sales of the issuers' stock, he had earned his stock essentially as his sole

compensation for helping the issuers go public, an arduous process that typically involved Ron

closely advising the issuers' management on their business plans and capital raises.  Ron also

held a significant percentage of his stock in the issuers through substantial drawdowns, reflecting

his honest belief in the issuers' potential.  In other words, Ron did not simply "dump" all his

shares during the stock's initial appreciation phase or even soon after price began to dip.

Ron acknowledges that his evasion of the SEC's beneficial ownership reporting

requirements was a serious offense, particularly given that it involved the use of nominees.  But

such reporting violations are typically prosecuted as a civil regulatory matter, not criminally.

Notably, the government has acknowledged that it has not identified any victims who lost money

as a result of Ron's offense conduct, and no such victims have come forward on their own.

We respectfully submit that a sentence of probation would not understate the seriousness

of Ron's offense, particularly when the other § 3553(a) factors are taken into account.  If the

Court disagrees, it still should impose only a short prison sentence (perhaps a few months).

Sentences far more lenient than the 36 months' imprisonment that Probation is recommending

for Mr. Bauer have been imposed on securities fraud defendants whose offenses involved far

more aggravated conduct and caused substantial financial losses to real victims.  *See, e.g.*, U.S. v.

Naqvi, No. 16-cr-00356-ER (S.D.N.Y.), ECF Nos. 83, 85, 99 (sentence of 15-months' time-served imposed on defendant who obtained $18 million from over 50 investors through fraudulent representations that the money would be used to buy pre-IPO shares of up-and-coming technology companies such as Twitter and Uber, but which in fact was used to perpetuate a "Ponzi-like" scheme and to fund the defendant's purchases of expensive homes and cars); U.S. v. Antos, No. 1:17-cr-00372-JS (E.D.N.Y.), ECF Nos. 1038, 1041, 1047 (sentence of one-day time-served imposed on "account executive" of boiler room that perpetrated a multi-year fraudulent penny stock pump-and-dump scheme that caused "out-of-pocket losses [of] more than $10,122,000" to victims identified by the Probation Office); U.S. v. Romandetti, No. 2:18-cr-00614-JS (E.D.N.Y.), ECF Nos. 146, 162 (sentence of six months' imprisonment imposed on healthcare company CEO who participating in a "multi-year pump-and-dump scheme involving his own company's stock and a 'boiler room' on Long Island" that caused $1.9 million in losses to "victim investors, many of whom were elderly"); U.S. v. Dhillon, No. 22-cr-10265-ADB (D. Mass.), ECF Nos. 75, 79, 81 (four-month term of imprisonment imposed on board chairman of two microcap biotechnology companies who "willfully circumvented the securities laws regarding stock sales by company insiders so that he could secretly pocket nearly $1.5 million" in sales proceeds, "then later . . . conspired with others to cause a life sciences company to secretly pay a subscription newsletter analyst to tout the company's stock offering," and then lied to the SEC during sworn deposition testimony in order to conceal his and his attorney's illegal stock sales).[54]

A prison sentence (let alone a 36-month prison sentence) also is not necessary to provide just punishment, afford adequate deterrence, or promote respect for the law. The collateral

---

[54] The defendants in U.S. v. Naqvi, U.S. v. Antos, and U.S. v. Romandetti had Guidelines offense levels of 30, 29, and 31, respectively. The defendant in U.S. v. Dhillon had a Guidelines offense level of 24.

consequences of indictment alone inflicted a massive—and very public—punishment on Ron. News of Ron's indictment spread quickly through the business community, rendering him a pariah on Wall Street and in London's finance community.  Ron had to withdraw from dozens of projects on which he had been working for years, was forced to forfeit the shares and deferred compensation that he was scheduled to earn from those projects, was stripped of his banking privileges, and essentially has been out of work since April 2022 because of the indictment.  This has crippled Ron and ████████ financially.  █████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████  Although Ron hopes that he will be able to resuscitate his business reputation to a fraction of what it once was and earn a decent living in the future, that process will take many, many years even in the best of circumstances.  In the meantime, the SEC's civil enforcement proceeding, and the possibility of significant civil monetary penalties, still is hanging over Ron's head.

Professional and financial devastation are not the only collateral consequences Ron suffered because of his indictment and guilty plea.  After being arrested by the London Metropolitan Police in front of his family at London Heathrow Airport in April 2022, Ron was placed on a form of house arrest and has been living under a curfew and strict travel restrictions for the past three years.  After negotiating a waiver of extradition and flying to JFK with law enforcement agents, Ron spent a night in custody in New York, an experience that we believed may have contributed to the ruptured disc in his lumbar spine.  Out of concern for his sons ████ and ████ Ron chose to become less of a presence at their school activities, which has been very painful for Ron.  Ron always has prided himself on his involvement in ████s and ████'s schools. But after his arrest, he did not want his situation to be a topic of chatter at ████'s and ████'s

school events, as he was concerned it could create a stressful situation for ███ and ███ He therefore decided to keep his involvement and presence more at the fringes.  But most devastating of all, the travel restrictions that were imposed on Ron after his indictment meant that he was unable to be by his father's side when his father passed away from pancreatic cancer in July 2023.[55]  That was the most severe punishment that could have been inflicted on Ron.  We respectfully submit that Ron already has been punished enough.

    Ron self-corrected his conduct almost a decade ago, and so a prison sentence is not needed for specific deterrence purposes.  Furthermore, the Court does not need to sentence Ron to prison, let alone to prison for years, for Ron's case to send a message of general deterrence to individuals participating in the world of finance and capital markets.  People paying attention to Ron's case now, or who might pay attention to it in the future, understand that being indicted and pleading guilty results, on their own, in a professional death penalty and financial ruin.  A prison sentence imposed on Ron Bauer will not be the difference between a white-collar professional flouting the federal securities laws or complying with them.  Nor will a sentence of probation inculcate a disrespect for the law.  To the contrary, a sentencing court's showing of mercy to a defendant who deserves it promotes respect for the law, because it shows that the law is not an inhumane blunt instrument that punishes for punishment's sake but instead will provide meaningful sentencing credit for the good a defendant has done in his life.

---

[55] The pancreatic cancer that took Ron's father's life progressed at warp speed after his unexpected diagnosis.  Ron's father died only a few weeks after the diagnosis.  The prosecutors worked with undersigned counsel to try to enable Ron to travel to Canada before his father died, but lifting Ron's travel restrictions required complex coordination between the Department of Justice and UK authorities.  Despite the prosecutors' best efforts, it was not possible to secure a relaxation of Ron's travel restrictions in time for Ron to see his father one final time.  Ron is thankful to the prosecutors for making such a great effort on such short notice.

### D.    The Kinds of Sentences Available

Other than 18 U.S.C. § 371's five-year statutory maximum, the requirement of

substantive reasonableness and § 3553(a)'s Parsimony Clause are essentially the only constraints

on the Court's sentencing discretion here.

The Court is authorized to impose a sentence of probation (of between one and five

years) in lieu of a term of imprisonment.  *See* 18 U.S.C. § 3561.  If the Court imposes a sentence

of probation, it is authorized to include an array of conditions of probation, including home

confinement and regular remote reporting to the Probation Office (similar to how Ron has been

remotely reporting to Pre-Trial Services for the past year).

If the Court believes a term of imprisonment is warranted, the Court is authorized to

(i) impose a term of imprisonment as short as a single day; (ii) include a period of supervised

release so that Ron might qualify for First Step Act credits; and (iii) delay Ron's reporting date to

July 2026, as the parties stipulated in Ron's plea agreement,



The reporting date delay in particular was a critical component of Ron's plea

agreement, and we thank the prosecutors' for their understanding and agreement that a reporting

delay (assuming Ron is sentenced to a term of imprisonment) is appropriate here

---

[56] It is not uncommon for courts to delay a defendant's reporting date to accommodate family caretaking
obligations.  In the college admissions scandal prosecuted in the District of Massachusetts, for example,
several married couples with dependent children entered guilty pleas.  With the consent of the
government, the district court agreed to delay one spouse's reporting date until the other spouse had
completed his or her prison sentence, which ensured that the couple's dependent children would have one
parent available to them at all times.

### E.    The Applicable Guidelines Range

Ron's plea agreement resolves any dispute about the applicable Guidelines range.  Ron's offense level is 30, based on (i) a base offense level of 6; (ii) a 20-level enhancement because, although the government was not able to determine whether the scheme caused any losses to any investors, the total net proceeds that Ron and his coconspirators received from their sales of the issuers' stock was more than $9.5 million but less than $25 million; [57] (iii) a 2-level mass marketing enhancement because the stock promotional materials were disseminated by mail; (iv) a 2-level sophisticated means enhancement because the offense conduct involved the use of nominee entities and took place predominantly overseas; (v) a 3-level role enhancement, because the conspiracy involved at least five participants and Ron supervised the actions of at least one of those participants;[58] and (vi) a 3-level reduction for Ron's timely acceptance of responsibility.  Ron has no criminal history, and so his advisory Guidelines range ordinarily would be 97-121 months.  Because, however, Ron's offense of conviction has a five-year statutory maximum, Ron's "stipulated Guidelines sentence" is 60 months.  *See* U.S.S.G. § 5G1.1(c).

Although we agree with the Guidelines calculation, we disagree that Ron's advisory Guidelines sentence fairly reflects the seriousness of his offense.  Ron's Guidelines offense level is driven almost entirely by the § 2B1.1 "loss enhancement" provision, notwithstanding that the government has acknowledged that it has not identified any victims of Ron's offense conduct and does not know whether any losses actually were incurred as a result of Ron's conduct.  Courts in

---

[57] If the Guidelines held Ron responsible only for Ron's personal gain from his stock sales (approximately $4 million), rather than the aggregate gains realized by all the scheme's coconspirators, he would have received only an 18-level enhancement.

[58] This role enhancement also disqualifies Ron from receiving a 2-level "zero point offender" reduction that he otherwise would have received.  Thus, this role enhancement effectively creates a 5-point difference in Ron's offense level.

the Second Circuit routinely have criticized the Guidelines as placing too much emphasis on "loss" amounts in determining a white-collar defendant's offense level score. *See, e.g.*, *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (Rakoff, J.). That criticism arguably applies doubly where the defendant's offense level is being driven by the conspiracy's aggregate *gain* because it is not possible to determine a loss figure or even whether there was a loss at all.

### F.    The Need to Avoid Unwarranted Sentencing Disparities

To comply with § 3553(a)(6), a sentencing court must seek to avoid imposing on a defendant (i) a harsher sentence than similarly situated defendants have received, and (ii) the same or similar sentence as more culpable defendants have received. *See Gall v. United States*, 552 U.S. 38, 55 (2007); *United States v. Dorvee*, 616 F.3d 174, 187 (2d Cir. 2010) (holding that, under *Gall*, a court must "guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct"). Section 3553(a)(6)'s plain language makes clear that the relevant point of comparison is the offenders' underlying *conduct*, not the underlying charges nor even the offenders' Guidelines offense levels. *See* 18 U.S.C. § 3553(a)(6). In this regard, § 3553(a)(6) reflects Congress's recognition that a defendant's Guidelines offense level does not automatically reflect, and indeed can dramatically overstate, the actual nature or seriousness of the defendant's offense.

At the outset, in determining whether a particular sentence would create an unwarranted sentencing disparity, we think the Court should take into account the practical impact that Ron's foreign citizen, non-resident status would have on any prison sentenced imposed.[59] Here, Ron's foreign citizen, non-resident status would (i) exacerbate the severity of any prison experience,

---

[59] This is what Judge McMahon did when she sentenced a foreign citizen, non-resident defendant in U.S. v. Connolly. *See* No. 16-cr-370-CM (S.D.N.Y.), ECF No. 457, at pp. 91-92 (transcript of sentencing proceeding for Conrad Black).

and (ii) as compared to a similarly-situated U.S. citizen offender, cause Ron to serve in a correctional facility a greater percentage of any prison sentence imposed.  This is for several reasons:

**First**, if Ron is sentenced to a term of imprisonment, the Atlantic Ocean will separate him from his wife and children, and it is unlikely that they would be able to visit Ron with any frequency (particularly given their precarious financial circumstances).  Ron's prison experience would therefore be substantially harder than a similarly-sentenced offender designated to a facility within reasonable proximity to family.

**Second**, according to former BOP Director Hugh Hurwitz, Ron's foreign citizen status likely would disqualify him from being designated to a camp, which means he likely would be designated to a low-security or, because of current bed space and BOP funding shortages, even a medium-security facility.[60]  For obvious reasons, time spent in a low- or medium-security facility is much more severe than time spent in a camp.

**Third**, █████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

**Fourth**, Ron's foreign citizen status would "complicate[ ]" Ron's receipt of First Step Act credits, which means that Ron likely would serve a greater percentage of his prison sentence in a BOP correctional facility than a similarly-situated U.S. citizen offender would—perhaps as much as 40% longer.  According to Mr. Hurwitz's analysis, in terms of the number of days spent in a

---

[60] *See* Exh. OO, Declaration of Hugh Hurwitz ("As a Criminal Alien, BOP will also likely house Mr. Bauer in a higher security facility than a similarly situated US Citizen.").

[61] *Id.*

correctional facility, a 36-month sentence imposed a U.S. citizen offender likely would be equivalent to a 24-month sentenced imposed on a foreign offender such as Ron, and sentencing Ron to 36-months' imprisonment would be like sentencing a U.S. citizen offender to 48-months' imprisonment.[62]

**Fifth**, there is a serious risk that, at the conclusion of any prison sentence that the Court were to impose on Ron, Ron would be subject to an ICE deportation detainer that could result in a lengthy (and unpredictable) period of ICE detention—potentially in an extremely harsh ICE facility.[63]  "In summary," if sentenced to a term of imprisonment, Ron "likely [would] serve substantially more time in prison than other U.S. citizen inmates with a similar profile and [would] do so in a higher security prison."[64]  All of this militates in favor of a sentence of probation or a sentence of imprisonment substantially shorter than what Probation is recommending.

In addition, we think the sentence Probation is recommending (or any lengthy prison sentence for that matter) would create an unwarranted sentencing disparity because it would impose on Ron a lengthy prison term for offense conduct that, in our view, typically is not criminally prosecuted at all.  As stated earlier in this sentencing memorandum, Ron's offense conduct was not the prototypical pump-and-dump scheme that traditionally has resulted in federal criminal prosecution.  Instead, Ron's offense conduct can be fairly described as a willful

---

[62] *Id.* (showing that Ron likely would serve ~40% more of any prison sentence in a correctional facility, as compared to a U.S. citizen given the identical sentence).

[63] *Id.*  This issue is addressed in the affidavit of Nixon Peabody partner Rachel Winkler, who previously served with the Department of Homeland Security and has significant experience on these issues.  *See* Exh. PP, Affidavit of Rachel Winkler.  Ms. Winkler believes that Ron's likelihood of being subject to deportation consequences and an ICE detainer will be higher if the Court sentences him to a year or more in prison.  *Id.*, ¶ 9.

[64] Exh. OO, Declaration of Hugh Hurwitz.

failure to disclose beneficial ownership information in violation of SEC reporting requirements, coupled with stock promotional campaigns that, even if distasteful, were not necessarily criminal in their own right. It is difficult to identify prior criminal securities fraud prosecutions involving conduct that is substantially identical to the offense conduct described in Ron's plea agreement. This is because, as a general matter, criminal prosecutions in which the defendant used nominee entities to evade the SEC's beneficial ownership reporting requirements also involve some or all of the following characteristics that are not present in Ron's offense conduct: (i) blatantly and demonstrably false factual statements about the issuers' business operations; (ii) boiler rooms and hard-selling tactics that target vulnerable victims; (iii) issuers that are essentially fake companies and lacked any assets with any arguable business potential; (iv) systematic, pervasive match trading and wash trading to "build the chart" in preparation for the final pump; and (v) dumping the entirety of the conspiracy's shares into the price appreciation caused by the pump.

If Ron's co-defendants Craig Auringer (who essentially was Ron's equal partner) and Daniel Ferris had been sentenced already, or if the Court were aware of what punishments the government is prepared to recommend for those defendants, those clearly would be the most valuable data points for the § 3553(a)(6) analysis.[65] Unfortunately, Mr. Auringer and Mr. Ferris have not been sentenced yet. We do not know what agreements (if any) they have with the government, and we do not know what sentences the prosecutors are prepared to recommend for them. We do know, however, that Ron's co-defendant Peter Mihaylov received a deferred prosecution agreement and then a nolle prosequi. Although we understand that the government's

---

[65] We acknowledge that Mr. Auringer and Mr. Ferris agreed to plead guilty earlier in time than Ron did, and we assume they may have cooperation agreements with the U.S. Attorney's Office. We think this is counterbalanced by the fact that Ron withdrew from the scheme, stopped associating with Blacklight, and self-corrected his behavior by early 2017, which we do not think is true of Mr. Auringer and Mr. Ferris.

treatment of Mr. Mihaylov may have been influenced by health-related issues, we respectfully submit that the disposition of the criminal charges against Mr. Mihaylov warrants some consideration by the Court under § 3553(a)(6).

Given the paucity (and perhaps total absence) of prior criminal sentences imposed for conduct that is substantially identical to Ron's offense conduct, we respectfully submit that the Court should, consistent with the Second Circuit's admonition in *Dorvee*, ensure that Ron's sentence is not similar to sentences imposed on securities fraud defendants who engaged in far more egregious conduct. *See Dorvee*, 616 F.3d at 187 (admonishing that sentencing courts must "guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct"). We think the sentences imposed on the defendants in U.S. v. Naqvi, No. 16-cr-00356-ER (S.D.N.Y.); U.S. v. Antos, No. 1:17-cr-00372-JS (E.D.N.Y.); U.S. v. Romandetti, No. 2:18-cr-00614-JS (E.D.N.Y.); and U.S. v. Dhillon, No. 22-cr-10265-ADB (D. Mass.), are instructive in this regard. The sentences in those cases, each of which we submit involved criminal conduct far more aggravated than Ron's offense conduct, ranged from one-day time-served to 15-months' time-served.

The defendant in U.S. v. Naqvi was the chief operating officer of a fraudulent enterprise that held itself out to unsuspecting investors as a legitimate investment advisory firm. The defendant's fake firm falsely represented to investors that the firm had access to pre-IPO shares of well-known growth companies that would soon be going public, including Twitter, Uber, and Alibaba. *See* No. 16-cr-00356 (S.D.N.Y.), ECF No. 85 (government sentencing memorandum). The defendant used these fraudulent representations to obtain approximately $18 million in investor funds. *Id.*, at p. 2. Only $7 million actually was invested, and it was not invested in the manner that the defendant represented to investors. *Id.* The firm lost over half of that $7 million

34

in foolish trading, and another $11 million was spent by the defendant and his coconspirators for personal purposes, including to purchase expensive homes and to pay off victims of an earlier scheme in "Ponzi-like fashion." *Id.* Despite this outrageous conduct and an offense level of 30, the defendant was sentenced to 15-months time-served.

The defendant in U.S. v. Antos was the operator of a boiler room that for at least four years targeted vulnerable victims and used "lies and high-pressure tactics" to convince victims to purchase the shares of worthless penny stocks. *See* U.S. v. Antos, No. 1:17-cr-00372-JS (E.D.N.Y.), ECF No. 1038, at pp. 1-2, 4 (government sentencing memorandum). The boiler room operation caused more than $10 million in out-of-pocket losses to victims. *See id.*, at 7. Despite the defendant's outrageous conduct, which included concocting fake names to lure victim investors, the court sentenced her to time-served, which based on the docket entries appears to have been only a single day. Her offense level was 29.

The defendant in U.S. v. Romandetti was the CEO of a penny stock company whose stock the defendant arranged to be fraudulently promoted by a boiler room operation. *See* U.S. v. Romandetti, No. 2:18-cr-00614 (E.D.N.Y), ECF No. 146, at p. 1 (government sentencing memorandum). The defendant and his coconspirators "manipulated the share price and volume" of the stock "via match and wash trades and through material misrepresentations and omissions in communications with the victim investors, many of whom were elderly." *Id.* The defendant "was a knowing participant in the pump-and-dump scheme and used codefendant Frank Sarro to conduct illegal trades and laundering transactions to hide his participation and knowledge of the scheme." *Id.* The defendant's Guidelines offense level was 31, which is a point higher than Ron's. The court nevertheless sentenced the defendant to six-months' imprisonment.

The defendant in U.S. v. Dhillon was the board chairman of two microcap biotechnology companies. *See* U.S. v. Dhillon, No. 22-cr-10265, ECF No. 75, at p. 1 (government sentencing memorandum). "While serving" as board chairman, the defendant "willfully circumvented the securities laws regarding stock sales by company insiders so that he could secretly pocket nearly $1.5 million. And then later, he conspired with others to cause a life sciences company to secretly pay a subscription newsletter analyst to tout the company's stock offering." *Id.* This was not a "one-time, unplanned mistake. To the contrary, he hatched his plan . . . the moment he became board chairman—the highest-ranking role in a corporation. And he did so not once, but twice." *Id.* at 11. What made the defendant's conduct even worse was that he "doubled down on his concealment when investigators later came knocking," submitting a false background questionnaire to the SEC and then perjuring himself during sworn testimony. *Id.* at p. 4. Despite all of this, the defendant received a sentence of only four months' imprisonment. Although the defendant's offense level was 24 (as compared to Ron's offense level of 30), the defendant's perjury and false statements contrast markedly with Ron's voluntary withdrawal from the scheme and self-correction of his conduct.

We respectfully submit that sentencing Ron to more time in prison than the defendants in U.S. v. Naqvi and U.S. v. Romandetti would be a major unwarranted sentencing disparity and that, if the Court imposes a term of imprisonment on Ron, it should be more along the lines of the four-month sentence the defendant received in U.S. v. Dhillon.

## III.    <u>CONCLUSION</u>

In sum, we respectfully submit that full consideration of all the § 3553(a) factors, with no one factor more important than the other, as is required, justifies a sentence of probation. If the Court believes that a sentence of imprisonment is necessary, the Court should impose a sentence

substantially shorter than the 36 months that Probation is recommending.  Moreover, if the Court imposes a sentence of imprisonment, we ask that (i) Ron's sentence include a period of supervised release so that Ron might qualify for First Step Act credits, and (ii) Ron's reporting date be delayed to July 2026 in accordance with terms of Ron's plea agreement, ████████ ████████████████████████████████████████████████.

We thank the Court for its time and attention.  Ron is looking forward to personally addressing the Court at the sentencing hearing.

Respectfully submitted,

*/s/ Aaron M. Katz*
Aaron M. Katz
AARON KATZ LAW LLC
399 Boylston Street, 6th Floor
Boston, MA 02116
(617) 915-6305
akatz@aaronkatzlaw.com

Dated: May 8, 2025